Granger, C. J.
On Nov. 4, 1876, William Edwards and others, partners as Edwards, Townsend, & Co., sued in Cuyahoga Common Pleas upon a note reading thus:
$¡164.38. November 15, 1874.
Turn months after date we promise to pay to the order of Shields and Ford, One hundred sixty-four and 38-100 Dollars, at The Ohio National Bank, Cleveland, Ohio.
Value received. Bedford Chair Co.,
Due Jan. 15-18-75. M. B. G. Wheelock,Pres.
[Indorsed,]
Shields & Ford,
A. J. Griswold.
*19 The indorsers, Shields & Ford and A. J. Griswold, by-separate answers, presented the same second defence. Shields & Ford stated it thus: “ And for this second defence, these answering defendants say that 'they sustain to said piece of commercial paper, simply the relation of indorsers, and so far as plaintiffs are concerned, are simply sureties for the payment thereof, that about the time of the maturity of said note, plaintiffs without the knowledge or consent of these defendants made and entered into an agreement with the defendant, the Bedford Chair Co., the maker of said note, by which they agreed to and did extend the time of payment to said Bedford Chair Co., for the period of sixty days to the great injury and -detriment to these answering defendants in this, to wit: that, at the time said note matured said Bedford Chair Co. was solvent, and said note could have been collected from it; but, that before the expiration of said sixty days, said Bedford Chair Co. became insolvent, and made a general assignment of its property for the benefit of all its creditors, and that said note cannot now be collected from it.” The plaintiffs by separate replies denied all the averments in. these defences except the one stating that said defendants were indorsers only.
If any agreement to extend time was ever made, it was so made in a conversation between Wheeloek, president-of the chair company, and Amos Townsend, one of the plaintiffs, in presence of Norval W. Chamberlain, also a plaintiff. At the trial, Wheeloek related it thus: —
“I made the arrangement with Mr. Townsend. I asked for additional time as a favor to the company. He said, as near as I can recollect, that he was willing to show any-reasonable favor. I think I said to him that I would give them paper drawn on our customers, and when I got them I left them with the book-keeper. I had no other talk with Mr. Townsend then, or at any time after the first talk. When I went there with the paper it was in pursuance of my talk with Townsend. I cannot say what time *20 was given, nor whether any definite or fixed time was given. My recollection is not sufficient to say whether there was a definite fixed time or not. Nothing was said as to the time the paper which was to be turned over was to run. Have stated all that occurred with Townsend that I recollect. I told him as we got paper we would turn it over. He said nothing in reply. This was in the same talk in which I asked for an extension. Had but one talk with him.
My principal talk was with Townsend, but the bookkeeper took some part in the conversation. Townsend said he was willing to grant, under the circumstances, any reasonable favor or leniency. This was in answer to my request for time. This is not the substance of his language, but rather the result. I asked Townsend, as a favor, for additional time, and he said, I am willing to grant any reasonable favor. I received the communication of June 7th from Edwards, Townsend, & Co. One $800 note was retxxrned in it, axxd $125 credited oxx the next note falling due. All of the other notes fell due before the one ixx suit. I think the oxxe returned in that letter fell due in Decembex’, 1874. In the talk with Townsend I think I spoke of my intention of turning over paper.
“ In my talk with Towxxsend, I can’t say whether any definite time .was fixed or not. I think the receipt for paper turned over was sexxt to the office of the company by the book-keeper of Edwards, Townsend, & Co. I think I left the paper turned over to thexn, with their book-keeper, in a hurry, and he xnade up a statement and sent it to the compaxiy. It was soxxxe time before I left the paper that I had the talk with Towxxsend — several weeks • — • I can’t tell exactly. I saw the letter of June 7th, and it was entered upon the books of the company. I don’t recollect that there was anything said in my talk with Townsend about interest. We were not released from paying. I think Mr. Townsend gave additioxxal time. *21 He said that he was willing to grant the favor. I asked him for time. I understood distinctly he said he would give additional time. That was what I asked for. I remember I went to Townsend and asked for additional time. That was the whole thing. I asked for time and it was granted.”
The following is a copy of the receipt given for the drafts referred to by Wheelock, when delivered by him: —
“ April 26, ’75.
Ree. from Bedford Chair Co. the following drafts, the proceeds of which, when paid, to apply on our claim against the Bedford Chair Co. Notes: J. W. Wheelock, Treas., April 1, ’75, @ 60 days, on J. G. Weiss, Pittsburgh, for $138.50. Also J. W. Wheelock, Treas., Mar. 25, ’75, @ 60 days, on C. Walter & Co., Allegheny, for $175.17. Also J. W. Wheelock, Treas., Mar. 29, ’75, @ 60 days, on F. & H. Brewster, Buffalo, for $123. Amounting to $436.67. The above described drafts will be sent forward for collection and when paid the proceeds will be endorsed on the Bedford Chair Co. notes and we will advise.
Edwards, Townsend & Co.”
■ And the following showed what was done with the proceeds of said drafts, and when: —
‘•‘■June 7, ’75.
Bedford Chair Co., Bedford.
We make the following disposition of the drafts received from you April 26th, ($436.67.). Your note of Nov. 24, ’74, @ 30 days given up, (enclosed herewith,) . $300.00
Interest on same, .... 7.25
Protest fee “ ..... 1.65
“ “ “ note of Oct. 6, . . 1.65
Indorsed • “ “ “ “ . . 125.62
$436.67
Yours, &e.,
Edwards, Townsend & Co.”
*22 Townsend being absent in Congress at. the time of the trial, Chamberlain alone testified for the plaintiffs thus: —
“ Wheelock came and had a talk with Mr. Townsend in my presence. He said the company were expecting remittances soon, and were expecting to make drafts on its customers, and which he would send in, or bring, to apply on the notes'we held against the company. '.There was no agreement to give any specified time. Neither was anything said about the time these drafts were to run. In a few days Wheelock brought them in, and I gave a receipt for them. The Bedford Chair Co. owed us in all, I think, about ($700.00) seven hundred dollars. The talk between Wheelock and Townsend was not over a week or ten days before the date of the receipt (April 26,1875). Wheelock came and introduced himself, and spoke of the Bedford Chair Co. paper, held by us, past due; that they were making- collections as fast as possible; that they had a right to draw for goods sold, and suggested that we take them, and, when paid, apply on our debt. Townsend said to bring or send them in, and we would collect and apply. Wheelock asked for no specified time, and none was given.”
A. J. Griswold, the indorser, testified: —
■' “I received the note in suit from Shields and Ford, and turned it over to plaintiffs to apply on my indebtedness to them. I went to see plaintiffs immediately after the note was protested. Shields and I went together. I told Chamberlain we had come to fix up that paper. He said Wheelock had come a day or two before, and they had given an extension of time. Shields then said, ‘that lets us out.’ Chamberlain made no reply. I asked him if security had been given, and he said ‘of course,’ or ‘ yes.’ He said they had given time on that as well as on other paper they had. This was' in the office of Edwards, Townsend, & Co. The talk did not last five minutes. We left the store. This was a few daj^s after the protest. We were prepared to take up the paper. *23 I expected to pay it. I had the money in bank to my credit or to that of A. J. Griswold Co. I said to Chamberlain, ‘ we have come to fix up that note.’ He said Wheelock was in a day or two before, and they had given an extension. Afterwards he mentioned having received security. Think the only part Shields took in the conversation was to say ‘ that lets us out.’ Think there was no reply either by Chamberlain or me. Chamberlain could hear the remark. I did not think the fact of his making no reply singular. Don’t recollect any further conversation. Think Chamberlain asked what I was doing, or how I was making it, or something of that sort, and I answered. Do7i’t recollect any pa7'ticular conversation about this note with Shields. Did not know he expected to pay it.”
A. J. Shields, another indorser, testified thus: —
“I reside in Hudson Township, Summit Co., Ohio. I am a member of firm of Shields & Ford, who indorsed this paper. We got it from the Bedford Ghair Co7npany for lumber, and tu7'ned it over to Griswold to pay a debt. I was served with notice of protest. Came to Cleveland, hunted up Griswold, and went to plaintiffs. Saw the bookkeeper. Can’t say whether it was Chamberlain. Did very little talking. Griswold said we had come to take care of the note, to pay it. I expected to pay it. I had the money in my pocket. The answer we got was, that they had made arrangements in regard to that, as well as other paper, to give further time. Then I or Griswold said that released us or released the indorsers. Don’t recollect whether there was any talk about security. I consulted Mr. Foster, after the note was protested, as to what I had better do. He advised me to take up the note, and prosecute the Bedford Chair Co. at once, as they were good and the note could be collected from it. I made arrangements to do so, and came to Cleveland for that purpose. Hunted up Griswold, and we went to see E. T. & Co., and there learned of the extension to the Chair Co. When Grisivold and I went to plaintiffs, I had the money in my pocket *24 to pay the note, and so told Griswold. I was the one who was going to pay it, and Griswold knew it. There was no talk with Griswold that he was to pay. He knew I was to pay. We did not ask for time, nor for two or three weeks further time. There was no such talk. Don’t recollect whether there was anybody present but Griswold, and Chamberlain and I. There may have been somebody at the desk. Think Chamberlain made no reply to the remark that we were let out.”
As to this alleged conversation, Chamberlain testified thus:—
“ Griswold, the defendant, came into the office with Shields, the defendant, a few days after this note was protested, and said they had come in' to see about that note. They both said they were not prepared just then to take care of it, and asked if they could have a few days’ additional time. I said I did not care which one paid it, and that Are had no objection to giving them a feAV days’ time. With this understanding they left. They did not say they came to take it up, or to take care of it. Neither of them said it. They both said they were not prepared to pay, and that it would be a great accommodation if we would Avait. If Wheelock had been in before, it was in my absence. I am sure Shields and Griswold came in soon after the maturity of the note, and that Wheelock came in a short time before the date of the receipt.”
In rebutter, Griswold testified: —
“ At the time Shields and I went into plaintiffs’ office, Ave did not ask for an extension of time, and we did not say Ave Avere not ready to pay. I owed plaintiffs other paper, and supposed the talks on the street referred to by Chamberlain were in reference to this other paper, and not in reference to this one in suit.”
The verdict was for the indorsers upon said second defence.
A motion for a new trial urged the following grounds: —
1. Said verdict was against the evidence in the case.
*25 2. Said verdict Avas against the law of the case.
3. Said plaintiffs were prevented by surprise, which ordinary prudence could not have guarded against, and which prevented plaintiffs from obtaining evidence material to sustain their cause.
4. Newly discovered evidence material for the plaintiffs which they could not, with reasonable diligence, have discovered and produced on the trial of said cause.
In support of the third and fourth grounds, affidavits by Amos Townsend (one of plaintiffs), W. L. Hemshert, their book-keeper, the former recounting the talk with Whee-lock, and the latter stating what was said between Gris-wold and Shields and Chamberlain, were filed; also one by Chamberlain, verifying copies of letters addressed by plaintiffs to Griswold, dated respectively June 4, Sept. 1, Sept. 25, and Nov. 17, 1875, dunning him on the note in suit; also copies of letters to Shields & Ford, dated Dec. 9 and 14,1875. The defence put in the affidavit of H. B. Foster, a lawyer consulted by them after they got notice of the protest of the note. The affidavit showed that Foster, having had a full conversation with Wheelock, shortly after his arrangement with plaintiffs for delay, was satisfied that although Wheelock thought the indorsers were released, yet in his (Foster’s) opinion, what had occurred between Wheelock and plaintiffs, as then related by him, did not release the indorsers, and he advised them to take up the note and sue on it themselves. He further said that afterwards Shields told him “ that he had been to Cleveland to take up the note as advised by me, and had been informed by some one in the office of Edwards, Townsend, & Co., the book-keeper, I think he said, at all events some one in charge of the office, in substance that Mr. Wheelock had arranged this note (with other matters) Avith them, that they had given Wheelock further time, and that it Avas all satisfactory.”
The court overruled the motion, and rendered judgment for the indorsers. The district court affirmed this judgment, and we are asked to reverse it.
*26 The evidence as to the real transaction between Whee-lock and the plaintiffs seems to us all on one and the same side; and we concur in the opinion, given to Shields & Ford by their counsel, that there was no such agreement for an extension of time as discharged the indorsers. Wheelock asked for .“indulgence,” “favor”; Townsend said he would grant anything reasonable. Wheelock said, in substance, that the company had no money to pay; but, as it had a right to draw on its customers, he would leave drafts with plaintiffs, who could apply the proceeds on the indebtedness of the company to them. The total amount of the drafts so left did not equal the sum due to plaintiffs on notes of the Chair Company that matured before the note herein sued on.
It is clear that neither party to this arrangement then had in view anything except such indulgence as a reasonable creditor ordinarily gives to a debtor who shows a purpose to do what he can to make payment. True, Wheelock, soon after, told Foster that in his opinion the indorsers were discharged; but at the same time, while the occurrence was fresh in his memory, and while he seemed anxious to convince the counsel for the indorsers that they were released, he related the facts; and in that counsel’s judgment these facts did not release his clients.
Nothing was said as to the number of days, or months, asked for or granted; no time was nam'ed for delivering the drafts. The authorities are united in holding that unless the extension agreed upon is for a time certain, or so described that it can be rendered certain, it does not discharge the surety; it does not take away the right of the holder to bring suit against the maker at pleasure. Such a receipt of the drafts did not constitute an agreement to defer suit until the drafts were due. They were held as collateral, and could be applied on judgments in case of suits by Edwards & Co. before the drafts matured.
But the defence urged that, granting this fact and law, Chamberlain’s statement to Griswold and Shields should *27 estop plaintiffs from, claiming that there was no enforceable agreement to extend time. Is this claim tenable ? Before that interview Shields had consulted Ms lawyer, Foster, who had heard Wheelock narrate what had occurred at the time the arrangement (whatever it was) was made. Wheelock had stated that time was given, and that he had promised to place drafts in plaintiffs’ hands. Foster advised Shields that the arrangement, as related by Whee-lock, did not release the indorsers. It is a fair inference upon this record, in the absence of evidence to. the contrary, that Shields informed Griswold of these facts. If Chamberlain told them what they testified to, he told them nothing new. He said “ Wheelock had come a: day or two before, and they had given him time.” . . . “ He said they had given time on that as well as on other paper they had.” ... “I asked Mm if security had been given, and he said, ‘Of course,’ or ‘Yes.’” . . . “The talk did not last five minutes. We left the store.” Shields recollected no t¿dk about security. When they left the store, what facts additional to those stated by Wheelock to Foster had they learned? It seems to a majority of the court that if “ security ” was referred to, Shields’ previous information showed him that it related to the drafts spoken of by Wheelock. If Chamberlain heard the words, “ that lets us out,” he made no reply, gave no express assent. Under certain circumstances “ silence gives consent.” But, before drawing.such an inference, we must find that Chamberlain heard the words. He denied that he did. Griswold’s opinion was that he could hear it. Shields said nothing on that point. Under the circumstances, “ silence ” by Chamberlain might justify an inference that he did not hear. If Griswold and Shields had heard Chamberlain’s statements, Avithout any knowledge of the arrangement made by Whee-lock, the claim to an estoppel would, after verdict, seem fully established. But a majority of the court think that such statements, made to them after they had been told Avhat Wheelock had actually done, do not establish an *28 estoppel. Upon the whole record, a majority of the court holds that the motion for a new trial should have been sustained.

Judgment reversed.